**FILED**

**MAR 0 9 2016**

JULIE RICHARDS JOHNSTON, CLERK
US DISTRICT COURT, EDNC
BY_____DEP CLK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES ex rel. MARTIN A. GINSBURG pro se, <br><br> Plaintiffs, <br><br> v. <br><br> PATRICK L. MCCRORY, individually and in his official capacity as Governor of North Carolina; ROY A. COOPER III, individually and in his official capacity as Attorney General of North Carolina; RICHARD BURR, individually and in his official capacity as Senator from the State of North Carolina and senior member of the North Carolina Congressional Delegation and duly elected representative of Plaintiff; HOWARD COBLE, individually and in his official capacity as Member of the United States House of Representatives and ranking Member of the North Carolina Delegation in the United States House of Representatives; GEORGE HOLDING, individually and in his official capacity as Member of the United States House of Representatives representing North Carolina District 13 and duly elected representative of Plaintiff; GARY PENDLETON, individually and in his official capacity as member of the House of Representatives of North Carolina representing District 49 and duly elected representative of Plaintiff; THOM TILLIS, individually and in his official capacity as Speaker of the House of Representatives of North Carolina; and KAY R. HAGAN, individually and in her official capacity as Senator from the State of North Carolina and duly elected representative of Plaintiff, <br><br> Defendants. | 5:16-CV-105-BO <br><br><br> COMPLAINT <br><br><br> DEMAND FOR JURY TRIAL |

**JURISDICTION AND VENUE**

1. This action arises under U.S. Const. art. 1, § 2, cl. 4; U. S. Const. amend 14; and 42 U.S.C. § 1983, 1985, 1986.

2. Jurisdiction inures to this court under 28 U.S.C. § 1331.

3. Venue is appropriate under 28 U.S.C. 1391(b).

4. This court has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## INTRODUCTION

5. This lawsuit seeks to [re]assert the sovereignty of citizens over their government in keeping with the traditions of the United States – sovereignty most familiarly described in the words of the [U]nanimous Declaration of the thirteen [U]nited States of America dated 4th July 1776, that "[w]e hold these truths to be self-evident, that all men are created equal . . . ." and ". . . . to secure these rights, [g]overnments are instituted among [m]en, deriving their just powers from the consent of the governed" and the remarks of President Lincoln at the Gettysburg, PA battle site given on 19th November, 1863, regarding government "of the people, by the people, for the people . . . ."

6. The founders of the United States recognized that to provide security and stability for its citizens, a government requires certain capabilities to enable fulfillment of essential governmental responsibilities; authority to bargain with other nations on behalf of the people, legislative authority to provide a stable system of laws throughout the nascent nation, judicial authority to enforce a system of laws.

7. Additionally, the actions of each component or branch of this new government would be subject to review and adjustment by the other branches for the protection and stability of society as a whole.

8. Owing to the new nation's foundational ideology that government exists at the discretion of and in service to the citizenry rather than the then long held belief that citizens owe all to their government and have no right to expectation of reciprocity of loyalty unless such reciprocity specifically serves to protect and advance the cause of government the United States was, at its formation, unique in world history.

9. This fundamental belief directly resulted in a representative form of government not previously experienced.

10. Recognizing that more densely populated members of the union might seek to subjugate lesser populated regions for their benefit, the founders took steps to prevent simple majority rule.

11. Representation in the federal government is apportioned by population in United States House of Representatives but equally among the several states in the United States Senate.

12. This allows heavily populated states to express their wishes in the House while providing security for the lesser populated states through their equality of representation in the Senate.

13. Another significant solution to this dilemma is expressed in the separation of powers iterated in the Constitution of the United States.

14. This mutual oversight capability has, throughout the history of the United States, protected the people of the United States from the tyranny and subjugation of pure majority rule and governmental excess.

15. History is replete with examples of majorities oppressing minorities through governmental action or with governmental support and the founders of the United States took great pains to assure that such treatment would not befall the citizenry of this then new nation.

16. By way of example; recent history includes two events notable for their similarity: the widely known Holocaust in which as many as FOURTEEN MILLION (14,000,000) non-combatants were killed in German controlled territories alone, including a significant majority of the Jewish and Gypsy populations in these areas comprised actions sanctioned by a duly constituted government coalition forming a majority of the representatives of the people; and the genocide of the late 20th century in Rwanda during which as many as two-thirds of the indigenous minority Tutsi peoples were slaughtered by the majority Hutu.

17. Violent revolution has long been the only viable means by which an oppressive government is removed from a position of control.

18. It is the opinion and belief of Plaintiff that violence is not an ethically acceptable manner of redress, requiring instead that such offenses to the sensibilities of the citizenry be brought before the judicial branch of government to protect the rights of all citizens at all times from unconscionable limitation, restriction, erosion, or infringement by governmental action or inaction.

19. The constitutional form of government established in the United States offered the world its first best hope for elimination of the need for death to ever be the price of liberty.

20. Governmental officers, at times, liken the operation and function of government to be akin to the operation of modern business, though many such proponents seem to fail to realize that if the analogy is accurate then the United States model, by law, is that of a charity or non-profit rather than a profit driven organization.

21. Administrative professionals and executives in businesses, including charities and non-profits around the world are, however routinely expected to anticipate vacancies in operational personnel positions.

22. Preparation to fill such vacancies by prescribed mechanisms – whether through advance preparation of position descriptions and identification of notification outlets or standing selection committees with policies and procedures in place to ensure a smooth and timely transition – is reasonably expected of management.

23. The State of Florida demonstrated that unexpected vacancies in the United States House of Representatives can be timely filled with diligence on the part of governmental authorities and officials when, following the unexpected death of Representative Bill Young on October 18, 2013, Florida was able to conduct elections and fill the vacancy in a period of 144 days – less than half the period scheduled by writs of election issued by Defendant McCrory – to fill a vacancy in the North Carolina Delegation only EIGHTY (80) days later.

24. Unyielding adherence to the election schedule as set out by Defendant McCrory led to the vacancy at issue spanning THREE HUNDRED (300) days: more than

double the time required to fill an unexpected vacancy in the Florida Delegation in 2013; more than one and one-half times the time required to fill an unanticipated similar vacancy in the North Carolina Delegation in 1796; and almost 8 times the time required to fill a similar unanticipated vacancy in the North Carolina Delegation in 2004.

25. During the time of the Fourth Congress of the United States, pre-dating electronic communication and mechanized transportation methods, Absalom Tatom resigned his seat in the United States House of Representatives June 1, 1796, and the State of North Carolina was able to fill the vacancy with William F. Strudwick elected and taking his seat December 13, 1796 in the United States House of Representatives; a period of 195 days.

26. During the 108th Congress the State of North Carolina demonstrated a capacity to fill a congressional vacancy in as little as 39 days from announcement of a vacancy until election of a successor.

27. In the election year of 2004 Representative Frank W. Balance, Jr. resigned his position effective June 11, 2004 with his successor elected on July 20, 2004, taking the oath of office the following day.

28. Members of the North Carolina Congressional Delegation contacted the office of the Governor to suggest a truncated Special Election schedule; aligning portions of the process with General Primary and Runoff elections, and expediting the following General Special Election to fill the vacancy earlier than the schedule proposed by Defendant McCrory to reduce the total fiscal burden of the process while still seating a new Representative as much as 130 days earlier than provided for in the Governor's schedule.

29. Defendant McCrory, through the Office of the Governor, announced that there would be no change to the schedule outlined, and in a letter addressed to members of the congressional delegation seeking more timely elections wrote that:

Numerous factors were taken into consideration when I reviewed the dates of the special election. Chief among these were reducing voter confusion, minimizing the cost to counties and the ease of election administration. Fairness to all potential candidates—Democratic, Republican and unaffiliated—was also a consideration. In the end, holding the special election on the same days as the general election was the simplest, least costly and least confusing option. *McCrory Letter Clears Up Misconceptions from Reps. Butterfield and Price http://www.governor.state.nc.us/newsroom/press-releases/20140114/mccrory-letter-clears-misconceptions-reps-butterfield-and-price* accessed [11/02/14 18:28:53]

30. The people of North Carolina have an inviolable right to protection from the government by which they consent to be governed and to remain free from fear that considerations other than the welfare of the people will be held as of greater import to their government than their reasonable expectation of representation and protection.

31. The people of North Carolina deserve due respect for their intelligence, education, insight, and capabilities by their servants without those servants denigrating the capacity of the citizenry in general to render decisions based upon enlightened self–interest.

32. Defendant McCrory failed his fiduciary duty as Governor to the citizens of the State entire through a failure to consider the right to representation and control over

government by the citizens directly impacted by this decision thereby denying the right to direct representation to the citizens of the Twelfth Congressional District (hereinafter "the District".

33.     This denial of direct representation to those citizens served to limit the availability of allies in the United States House for other members of the North Carolina Delegation and poses a credible, imminent threat to the rights of all North Carolinians to fill vacancies in elected office at the pleasure of the Executive without regard to the duty to protect those rights above all other concerns by setting the dangerous precedent that delays for considerations other than protection of the rights of all citizens is acceptable.

34.     Precedent, being an essential and routinely prioritized consideration in governmental action, has been now established wherein financial considerations are given greater import than the fundamental right to representation of the citizens of North Carolina in government.

35.     This precedent, set by a government official elected by statewide ballot is a failure to hold the rights of the citizenry, and therefore the will of the people, as sacrosanct.

36.     The Office of the Attorney General of North Carolina failed to act to compel the Executive Branch to fulfill its fiduciary duty to the citizens of North Carolina, thereby permitting the Executive Branch to violate the right to representation inherent in citizenship and pose a credible threat to the rights of all North Carolinians to fill vacancies in elected office at the pleasure of the Executive without regard to the duty to protect those rights above all other concerns by setting the dangerous precedent that delays for considerations other than protection of the rights of all citizens is acceptable.

37. The North Carolina House of Representatives failed to act to compel the Executive Branch to fulfill its fiduciary duty to the citizens of North Carolina, or remove the offending Executive through the impeachment process, thereby permitting the Executive Branch to violate the right to representation inherent in citizenship and pose a credible threat to the rights of all North Carolinians to fill vacancies in elected office at the pleasure of the Executive without regard to the duty to protect those rights above all other concerns by setting the dangerous precedent that delays for considerations other than protection of the rights of all citizens is acceptable.

38. Per the published statements of the Office of the Governor, costs of a Special Election to fill a vacancy in the United States House of Representatives would exceed ONE MILLION DOLLARS ($1,000,000), though even at double that cost the burden per resident of the affected Congressional District would be approximately TWO DOLLARS and EIGHTY SIX CENTS ($2.86) per capita.

39. The cost burden of a Special Election to fill such a vacancy in representation as occurred in this situation if shared among all North Carolinians even at TWO MILLION DOLLARS ($2,000,000) would equate to a per capita expenditure of less than THIRTY CENTS ($0.30).

40. This economically insignificant added cost to the citizenry is a reasonable alternative to the loss of more than SEVEN (7) per cent of North Carolina's Delegation to the United States House of Representatives.

41. It is reasonable to expect that citizens statewide would stand ready to assist their fellows without regards to, and almost certainly in the face of, such a minimal cost.

42. One must question Defendant McCrory's belief in the value of economy in the administration of government when one realizes that the office of the Twelfth Congressional District of North Carolina billed the taxpayers of North Carolina and the other United States for the operation of an office that possessed the capability to do no more than answer the mail and phones to refer constituents to other agencies.

43. These referrals resulted in no representation or advocacy, as is the norm, resulting only in delaying services to those most in need in our society, yet cost the citizens of North Carolina and the entire United States hundreds of thousands dollars.

44. To further require that all citizens in the District bear the fiscal burden of party primary elections in addition to the constitutionally required election of a Member of Congress rather than requiring political parties to bear the cost burden of candidate selection presents a financial challenge that forces the choice between government services and supporting political parties.

45. Requiring political parties to conduct, and finance, their own candidate vetting and selection process is no different than requiring users to pay their fair share for services, much like bridge, highway, and ferry tolls, highway use taxes and excise taxes.

46. Defendants petulantly refuse to alter their perspective and place their preferences and lesser loyalties to party, rather than nation, ahead of their responsibility to faithfully execute their Constitutional duties to serve the people of North Carolina.

47. Given the costs of operation of impotent offices, and with financial burden of timely elections cited as rationale; one is left only with the conclusion that the reasoning behind these acts of both commission and omission on the part of Defendants, is untruthful on its face.

48. Evidence of this untruthful disregard for the citizens of North Carolina is abundant in the recent decision to hold two Primary Elections, two run-off elections, and finally, a General Election in the face of recent court rulings voiding the re-districting plan set out by the North Carolina General Assembly.

49. Scheduling all Primary Elections for 7 June, 2016, with following run-off elections, thereby eliminating one statewide election cost burden would be the fiscally prudent thing to do.

## THE PARTIES

50. At all times relevant hereto, Plaintiff was and is a resident of Wake County, North Carolina.

51. At all times relevant hereto, Defendant Patrick L. McCrory ("McCrory") was and is a resident of Wake County, North Carolina and maintains an official office in Wake County, North Carolina.

52. At all times relevant hereto, Defendant Roy A. Cooper III ("Cooper") was and is a resident of Wake County, North Carolina and maintains an official office in Wake County, North Carolina.

53. At all times relevant hereto, Defendant Thom Tillis ("Tillis") was and is a resident of Mecklenburg County, North Carolina and maintained an official office in Wake County, North Carolina.

54. At all times relevant hereto, Defendant Richard Burr was and is a resident of Forsyth County, North Carolina and maintains an official office in Wake County, North Carolina.

55. At all times relevant hereto, Defendant Kay R. Hagan ("Hagan") was

and is a resident of Guilford County, North Carolina and maintained an official office in Wake County, North Carolina.

56. At all times relevant hereto, Defendant Howard Coble ("Coble") was and is a resident of Guilford County, North Carolina and maintains frequent contact with State Officials in coordinating the North Carolina Congressional Delegation as its senior member in Wake County, North Carolina.

57. At all times relevant hereto, Defendant George Holding ("Holding") was and is a resident of Wake County, North Carolina and maintains an official office in Wake County, North Carolina.

58. At all times relevant hereto, Defendant Gary Pendleton ("Pendleton") was and is a resident of Wake County, North Carolina and maintains an official office in Wake County, North Carolina.

## COMPLAINT

COMES NOW the above-named Plaintiff, pro se, and for his complaint, respectfully states to the Court as follows:

### COUNT ONE

59. Representative Mel Watt ("Watt") announced his intention to resign his seat, effective January 6, 2014, in the United States House of Representatives in December, 2013.

60. The position of Member of the United States House of Representatives held by Watt was vacated by resignation effective January 6, 2014.

61. Defendant McCrory was made aware of Mr. Watt's intention to resign his position causing this vacancy prior to December 10, 2013.

62. Defendant McCrory had a period of twenty-seven calendar days, corresponding to nearly four weeks, or sixteen days on which the business of the State could be conducted, to prepare for this vacancy.

63. Defendant McCrory properly withheld announcement of the final determination of scheduling for the special election to fill this vacancy until Mr. Watt officially resigned. \

64. Defendant McCrory, elected to office by statewide ballot and therefore charged with the protection of the rights of all citizens equally, failed in this duty to all citizens of the State of North Carolina by failing to timely fill a vacancy in the North Carolina Congressional Delegation.

65. Defendant McCrory prioritized concerns related to perceived potential voter confusion – such concern implying a lack of sufficient sophistication among the voters of North Carolina and especially the 12th Congressional District – above protection of the right to representation of all citizens of the State of North Carolina through a failure to provide a full Delegation complement through a failure to timely fill a vacancy in the Delegation.

66. Defendant McCrory prioritized concerns related to cost of the election process – approximately $1.43 per capita in the affected district or less than $0.15 per capita borne by the full citizenry of the State – above protection of the right to representation of all citizens of the State of North Carolina through a failure to provide a full Delegation complement through a failure to timely fill a vacancy in the Delegation.

67. Defendant McCrory prioritized concerns related to ease of election administration of the election process, and limiting an imagined burden upon the State Board of Elections and its employees, above protection of the right to representation of all citizens of the State of North Carolina through a failure to provide a full Delegation complement through a failure to timely fill a vacancy in the Delegation.

68. Defendant McCrory prioritized concerns related to ease of election administration of the election process, and limiting an imagined burden upon the county Boards of Election and their employees, above protection of the right to representation of all citizens of the State of North Carolina through a failure to provide a full Delegation complement through a failure to timely fill a vacancy in the Delegation.

69. Defendant McCrory failed to identify protection of the interests of the citizens of the State of North Carolina in public comments in defending or explaining the rationale for the schedule for special election announced January 6, 2014.

70. Defendant McCrory failed to timely fill the vacancy through a failure to conduct a special primary less than sixty days from the date of Mr. Watt's resignation.

71. Defendant McCrory failed to timely fill the vacancy through a failure to prepare for a special runoff election less than seventy-three days from the date of Mr. Watt's resignation.

72. Defendant McCrory failed to timely fill the vacancy through a failure to prepare for a special general election less than one hundred thirty days from the date of Mr. Watt's resignation.

73. Defendant McCrory's failure of fiduciary obligations as a governmental officer elected by statewide ballot, both constitutional and statutory, implied and justly

inferred, to maintain a full U.S. Congressional Delegation represents a de facto violation of the civil rights of all citizens of the State adversely impacting all citizens of this state.

74. Defendant McCrory's failure of fiduciary obligations as a governmental officer elected by statewide ballot, both constitutional and statutory, implied and justly inferred, to maintain a full U.S. Congressional Delegation represents a willful and wanton disregard for the financial burden borne by the People of the United States who jointly were taxed the cost of a vacant office.

75. Defendant McCrory's failure to protect and preserve Plaintiff's civil rights as demonstrated by a willful, wanton, and callous disregard for the rights of the people of North Carolina constitutes interference with the right to representation.

76. Defendant McCrory denied access to the insight, information, perspective, resource augmentation, and support of a Delegation member available to other members of the North Carolina Congressional Delegation and their constituencies through a failure to timely fill a vacancy in the Delegation.

77. Defendant McCrory caused the people of the State of North Carolina to share the burden of operation of the office of the Twelfth Congressional District without the benefit of a representative to serve the citizens of the District.

78. Defendant McCrory caused financial harm to the people of the United States by causing operation of the office of the Twelfth Congressional District without the benefit of a representative to serve the citizens of the District.

79. Defendant McCrory's actions wrongly establish Executive precedent of prioritizing the convenience of servants of the people over protection of the right of the people to representation in and access to their government.

80. Defendant McCrory's actions wrongly establish Executive precedent of prioritizing fiscal perceptions of a single individual servant of the people over protection of the right of the people to representation in and access to their government.

## COUNT TWO

81. The Plaintiff hereby re-alleges and incorporates by reference all prior paragraphs of this Complaint.

82. Defendant Cooper failed to intervene on behalf of the citizens of North Carolina.

83. Defendant Cooper failed to initiate litigation to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

84. Defendant Cooper failed to advise the North Carolina House of Representatives of the responsibility to call for impeachment of Defendant McCrory for failure to fulfill the fiduciary duties of protection of the citizenry.

## COUNT THREE

85. The Plaintiff hereby re-alleges and incorporates by reference all prior paragraphs of this Complaint.

86. Defendant Tillis failed to intervene on behalf of the citizens of North Carolina.

87. Defendant Tillis failed to initiate censure of Defendant McCrory for failure to timely execute Executive responsibilities for the protection of the citizens of the State.

88. Defendant Tillis in the leadership role of Speaker failed to bring to the North Carolina House of Representatives a call for impeachment of Defendant McCrory for failure to fulfill the fiduciary duties of protection of the citizenry.

## COUNT FOUR

89. The Plaintiff hereby re-alleges and incorporates by reference all prior paragraphs of this Complaint.

90. Defendant Burr, as a statewide elected official and senior member of the North Carolina Congressional Delegation, failed to intervene on behalf of the citizens of North Carolina.

91. Defendant Burr failed to demand legislative action to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

92. Defendant Burr failed to demand litigation of Defendant Cooper to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

93. Defendant Burr failed to initiate litigation to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

## COUNT FIVE

94. The Plaintiff hereby re-alleges and incorporates by reference all prior paragraphs of this Complaint.

95. Defendant Hagan, as a statewide elected official and member of the North Carolina Congressional Delegation, failed to intervene on behalf of the citizens of North Carolina.

96. Defendant Hagan failed to demand legislative action to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

97. Defendant Hagan failed to demand litigation of Defendant Cooper to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

98. Defendant Hagan failed to initiate litigation to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

COUNT SIX

99. The Plaintiff hereby re-alleges and incorporates by reference all prior paragraphs of this Complaint.

100. Defendant Coble, as an elected official and senior member of the North Carolina Delegation to the United States House of Representatives, failed to intervene on behalf of the citizens of North Carolina.

101. Defendant Coble failed to demand legislative action to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

102. Defendant Coble failed to demand litigation of Defendant Cooper to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

103. Defendant Coble failed to initiate litigation to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

COUNT SEVEN

104. The Plaintiff hereby re-alleges and incorporates by reference all prior paragraphs of this Complaint.

105. Defendant Holding, as an elected official and member of the North Carolina Delegation to the United States House of Representatives, failed to intervene on behalf of the citizens of North Carolina and the District of which he is a chosen servant.

106. Defendant Holding failed to demand legislative action to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

107. Defendant Holding failed to demand litigation of Defendant Cooper to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

108. Defendant Holding failed to initiate litigation to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

## COUNT EIGHT

109. The Plaintiff hereby re-alleges and incorporates by reference all prior paragraphs of this Complaint.

110. Defendant Pendleton, as an elected official and member of the North Carolina House of Representatives, failed to intervene on behalf of the citizens of North Carolina and the District he was elected to serve.

111. Defendant Pendleton failed to demand legislative action to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

112. Defendant Pendleton failed to demand litigation of Defendant Cooper to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

113. Defendant Pendleton failed to initiate litigation to compel timely execution of Executive responsibilities for the protection of the citizens of the State.

WHEREFORE, Plaintiff prays for the following:

1. Repayment by defendants, jointly and severally, to the Treasury of the United States a sum certain determined by the United States Office of Management and Budget equal to the total cost of operation of subject vacant office for the period of the vacancy.

2. Repayment of costs incurred to include, and not be limited to: wages; salaries; retirement; accrued vacation and sick leave; employer contributions to federal retirement and health or medical funds; office rental; utility usage; or any other costs associated with or based upon continuing operation a vacant office of a member of the United States House of Representatives.

3. Specific performance order to the Governor of the State of North Carolina to submit to the General Assembly recommended legislation to define the maximum time period permitted for the conduct of elections to fill governmental vacancies requiring elections to no greater than the legislative minimum time to conduct such elections plus 21 days within 21 days of such order.

4. Specific performance order to the Speaker of the House of Representatives of the North Carolina General Assembly to bring to the House legislation to limit the maximum time period for the conduct of such elections to no greater than the legislative minimum time to conduct such elections plus 21 days within 21 days of such order.

5. Specific performance order to each Defendant to personally author and hand-write an apology to each member of the immediate family of each member of United States Armed Services whose residence of record was in the State of North Carolina killed in service during the period of 06JAN14 through 12NOV14 ("the vacancy") inclusive as identified by the United States Department of Defense;

6. Specific performance order to each Defendant to personally author and hand-write an apology to each member of United States Armed Services whose residence of record was in the State of North Carolina wounded in service during the vacancy as identified by the United States Department of Defense;

7. Specific performance order to specify authorship requirements for apology letters, to wit: no more than TWENY FIVE (25) per cent similarity in content or construction when compared across written apologies;

8. Specific performance of each defendant requiring personal delivery at a time and place convenient to the apology recipients;

9. Specific performance of each defendant to submit to the court an authorship statement for each letter of apology required by such orders; Plaintiff further moves that such statement of authorship read:

I, the undersigned, certify that the foregoing is my own original work specific to the above entitled matter. What assistance I have had has been limited to minor editing and proof-reading.

Where I have used the words, or ideas or information of others I have duly acknowledged my indebtedness by openly citing my specific sources and

using appropriate signal phrases and/or citations, providing a works cited or reference list in MLA, APA, or Blue Book format.

I do this in the spirit of honor, integrity, respect, and transparency in my dealings with others.

10. Specific performance order to each defendant to preface and conclude all public comments related to the candidacy for or execution of public office as follows;

I have been found to hold my personal beliefs above and of greater importance than the rights of my fellow citizens and must advise that my words be taken at the value afforded one who has failed in his/her performance of sworn duties. My words must be further considered in light of my abject failure to uphold an oath sworn before and in the name of my chosen deity. Such an oath, generally regarded as that which will never be broken, once broken, renders my promises without value and causes me to be a person in whom none may trust.

11. Judgment in the alternative against each of Defendants McCrory, Cooper, Burr, Coble, and Tillis, due to their respective leadership roles, the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00), such funds to be placed in trust and managed without remuneration by a manager designated by Plaintiff or by a manager selected by a two-thirds majority of surviving members receiving apologies from Defendants as provided by specific performance order for the per stirpes benefit of the progeny of the deceased for purposes of education;

12.     Judgment in the alternative against each of Defendants Hagan, Holding, and Pendleton due to their respective non-leadership roles in the amount of TWO HUNDRED FIFTY THOUSAND DOLLARS ($250,000.00), such funds to be placed in trust and managed without remuneration by a manager designated by Plaintiff or by a manager selected by a two-thirds majority of surviving members receiving apologies from Defendants as provided by specific performance order for the per stirpes benefit of the progeny of the deceased for purposes of education;

13.     Pay the costs of this action;

14.     Such other relief as this Court may deem just and proper.

Plaintiff requests with respect a jury trial on all issues triable of right by jury per Fed. R. Civ. P. 38(a).

Plaintiff further respectfully requests on issues determined by the court not triable of right by jury that an advisory jury be empanelled per Fed. R. Civ. P. 39(c).

Respectfully submitted, this the 9th day of MARCH, 2016 C.E.

Martin A. Ginsburg
4030 Wake Forest Road
Suite 300
Raleigh, NC 27609
Telephone: (919) 719-7242
E-mail: OX75Z2VeM@MarGin-Consulting.com